**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **JODI SMITH**, Individually and on Behalf of All Others Similarly Situated, | Case No. 7:21-cv-1534 |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| **NURTURE, INC.**, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

1.     Plaintiff Jodi Smith ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her undersigned attorneys, brings this Class Action Complaint against Defendant Nurture, Inc. ("Nurture, Inc." or "Defendant"), for its negligent, reckless, and/or intentional practice of misrepresenting and failing to fully disclose the presence (or material risk of) heavy metals and perchlorates in its baby food sold throughout the United States.  Plaintiff seeks both injunctive and monetary relief on behalf of the proposed Class (as defined herein), including requiring full disclosure of all such substances in its marketing, advertising, and labeling and restoring monies to the members of the proposed Class. Plaintiff alleges the following based upon personal knowledge as well as investigation by her counsel, and as to all other matters, upon information and belief (Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery).

## NATURE OF THE ACTION

2.     Parents like Plaintiff trust manufacturers like Defendant to sell baby food that is safe, nutritious, and free from harmful toxins, contaminants, and chemicals. They certainly expect

the food they feed their infants and toddlers to be free from Heavy Metals and Perchlorate, substances known to have significant and dangerous health consequences.[1]

3.      Consumers lack the scientific knowledge necessary to determine whether the Defendant's products do in fact contain (or have a material risk of) Heavy Metals and Perchlorate or to know or ascertain the true nature of the ingredients and quality of the Products. Reasonable consumers therefore must and do rely on Defendant to honestly report what its products contain.

4.      A recent report by the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform reveals that parents' trust has been violated (the "Subcommittee's investigation"). Ex. 1. The Subcommittee's investigation of the seven largest baby food manufacturers in the United States, including Defendant, was spurred by "reports alleging high levels of toxic heavy metals in baby foods" and the knowledge that "[e]ven low levels of exposure can cause serious and often irreversible damage to brain development." Ex. 1 at 2.

5.      As the Subcommittee noted, its investigation disclosed Defendant's "reckless disregard for the health of babies." *Id.* at 43.

6.      Defendant knows that its customers trust the quality of its products and that they expect Defendant's products to be free of Heavy Metals and Perchlorate. It also knows that certain consumers seek out and wish to purchase premium baby foods that possess high quality ingredients free of toxins, contaminants, or chemicals and that these consumers will pay more for baby foods they believe possess these qualities than for baby foods they do not believe possess these qualities.

7.      As such, Defendant's promises, warranties, pricing, statements, claims, packaging, labeling, marketing,  advertising, and material nondisclosures (hereinafter collectively referred to

---

[1] As used herein, the phrase "Heavy Metals" is defined as arsenic, cadmium, lead, and mercury.

as "Marketing" or "Claims") (hereinafter collectively referred to as "Marketing" or "Claims") center on representations and pictures that are intended to, and do, convey to consumers that their baby food, including its Contaminated Baby Foods,[2] possess certain qualities and characteristics that justify a premium price.

8.     No reasonable consumer seeing Defendant's Marketing would expect the Contaminated Baby Foods to contain Heavy Metals, Perchlorate, or other undesirable toxins or contaminants. Furthermore, reasonable consumers, like Plaintiff, would consider the mere inclusion of Heavy Metals, Perchlorate, or other undesirable toxins or contaminants a material fact when considering what baby food to purchase.

9.     Defendant intended for consumers to rely on its Marketing, and reasonable consumers did in fact so rely. However, Defendant's Marketing is deceptive, misleading, unfair, and/or false because, among other things, the Contaminated Baby Foods include undisclosed Heavy Metals, Perchlorate, or other undesirable toxins or contaminants.

10.     Defendant's Contaminated Baby Foods do not have a disclaimer regarding the presence of Heavy Metals or other undesirable toxins or contaminants that would inform consumers that the Contaminated Baby Food contain Heavy Metals and Perchlorate and/or that Heavy Metals and Perchlorate can accumulate over time in a child's body to the point where poisoning, injury, and/or disease can occur.

11.     Defendant's wrongful Marketing, which includes misleading, deceptive, unfair, and false Marketing and omissions, allowed it to capitalize on, and reap enormous profits from,

---

[2] The phrase "Contaminated Baby Foods" collectively refers to Defendant's products sold for consumption by babies and children. These products are sold under the "Happy Baby," Happy Tot" and "Happy Kid" brands. Plaintiff reserves her right to include in this action any products sold by Defendant deemed to contain Heavy Metals and Perchlorate following discovery.

consumers who paid the purchase price or a price premium for Contaminated Baby Food that was not sold as advertised. And Defendant continues to wrongfully induce consumers to purchase its Contaminated Baby Food that are not as advertised.

12.     Plaintiff brings this proposed consumer class action individually and on behalf of all other members of the Class (as defined herein) who, from the applicable limitations period up to and including the present, purchased for use and not resale any of Defendant's Contaminated Baby Foods.

## JURISDICTION AND VENUE

13.     This Court has original jurisdiction over all causes of action asserted herein under the Class Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value or $5,000,000 exclusive of interest and costs and more than two-thirds of the Class resides in states other than the state in which Defendant is a citizen and in which this case is filed, and therefore any exemptions to jurisdiction under 28 U.S.C. §1332(d)(2) do not apply.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Plaintiff suffered injury as a result of Defendant's acts in this district, many of the acts and transactions giving rise to this action occurred in this district, and Defendant conducts substantial business in this district and is headquartered in this district. Defendant has intentionally availed itself of the laws and markets of this district, and Defendant is subject to personal jurisdiction in this district.

## THE PARTIES

15.     Plaintiff is a citizen of the state of Minnesota. She purchased the Contaminated Baby Foods, various flavors of Defendant's pouches; snacks (including puffs, teething biscuits, creamies, and yogis) bars, and cereal, for her children generally from Target. Plaintiff first purchased the Contaminated Baby Foods in approximately July 2017 and last purchased the Contaminated Baby Foods in approximately August 2020.

16.     Plaintiff believed she was feeding her children healthy, nutritious food during the time she purchased and fed her children the Contaminated Baby Foods. Due to the false and misleading claims and omissions by Defendant, she was unaware the Contaminated Baby Foods contained any level of Heavy Metals or Perchlorate and would not have purchased the food if that information had been fully disclosed.

17.     As the result of Defendant's negligent, reckless, and/or knowingly deceptive conduct as alleged herein, Plaintiff was injured when she paid the purchase price or a price premium for the Contaminated Baby Foods that did not deliver what they promised. She paid the purchase price on the assumption that the labeling of the Contaminated Baby Foods was accurate and that it was free of Heavy Metals and Perchlorate and safe to ingest. Plaintiff would not have paid the money had she known that the Contaminated Baby Foods contained excessive degrees of Heavy Metals and Perchlorate. Further, should Plaintiff encounter the Contaminated Baby Foods in the future, she could not rely on the truthfulness of the Marketing, absent corrective changes to the packaging and advertising of the Contaminated Baby Foods. Damages can be calculated through expert testimony at trial.

18.     Defendant Nurture, Inc. is incorporated under the laws of Delaware and maintains its principal place of business and headquarters at 1 Maple Avenue, White Plains, New York 10605. Defendant formulates, develops, manufactures, labels, distributes, markets, advertises, and sells Happy Family Organics products, including the Contaminated Baby Foods, under the Happy Baby, Happy Tot and Happy Kid brands throughout the United States. Defendant created, allowed, negligently oversaw, and/or authorized the unlawful, fraudulent, unfair, misleading, and/or deceptive labeling and advertising for the Contaminated Baby Foods.

19.    The Marketing for the Contaminated Baby Foods, relied upon by Plaintiff, was prepared, reviewed, and/or approved by Defendant and its agents at its headquarters in New York and was disseminated by Defendant and its agents through marketing, advertising, packaging, and labeling that contained the misrepresentations alleged herein. The Marketing for the Contaminated Baby Foods was designed to encourage consumers to purchase the Contaminated Baby Foods and reasonably mislead the reasonable consumer, i.e., Plaintiff and the Class members, into purchasing the Contaminated Baby Foods. Moreover, the management decisions relating to quality control, manufacturing and packaging of the Contaminated Baby Food occurred in New York throughout the Class Period.

20.    The Contaminated Baby Foods include all flavor profiles or varieties in the following product categories (that can be further subdivided by development stage and/or product line):

a)    Happy Baby, Happy Tot, and Happy Kid pouches, , including:



b) Happy Baby and Happy Tot snacks, including:

  

  

c) Happy Baby jars, including:

  

d)  Happy Tot mealtime, including:

 

e)  Happy Baby Infant Formula, including:





f)   Happy Tot and Happy Kids Bars, including:

  

g)   Happy Baby Cereal, including:

  

h)   Happy Tot bowls, including:

  

## FACTUAL ALLEGATIONS

### I.     A Congressional Investigation Found the Presence of Heavy Metals in Baby Foods

21.     On February 4, 2021, the U.S. House of Representatives' Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, published a report detailing its findings that Heavy Metals—including arsenic, cadmium, lead, and mercury—were present in "significant levels" in numerous commercial baby food products. Ex. 1.

22.     Defendant was one of the baby food manufacturers from whom the Subcommittee requested and obtained internal documents and test results. The investigation found the following with respect to heavy metals:

a)     **Arsenic**: Defendant "sold baby foods after tests showed they contained as much as 180 parts per billion (ppb) inorganic arsenic." *Id.* at 3. Further, "[o]ver 25% of the products Nurture tested before sale contained over 100 ppb inorganic arsenic," and its "typical baby food product [] sold contained 60 ppb inorganic arsenic." *Id.*

b)     **Lead**: Defendant "sold finished baby food products that tested as high as 641 ppb lead. Almost 20% of the finished baby food products that Nurture tested contained over 10 ppb lead." *Id.*  "Internal testing data from Gerber, ***Nurture***, Beech-Nut, and Hain demonstrate that all four companies sold products or used ingredients with significant amounts of lead." *Id.* at 22 (emphasis added). "All companies, whether they test their final products or merely their ingredients, sold baby foods even when they or their ingredients contained unsafe levels of lead." *Id.*

c)     **Cadmium**: "Sixty-five percent of Nurture (Happy Baby) finished baby food products contained more than 5 ppb cadmium." *Id.* at 3.

d)    **Mercury**: "Nurture (Happy Baby) sold finished baby food products containing as much as 10 ppb mercury." *Id.*

23.    The investigation found that, when baby food manufacturers were left to self-regulate and establish their own Heavy Metals standards, they routinely failed to abide by their own standards and that the "[i]nternal company standards permit dangerously high levels of toxic heavy metals," and manufacturers, like Defendant, "have often sold foods that exceeded those levels." *Id.* In fact, Defendant "sold all products tested, regardless of how much toxic heavy metal the baby food contained." *Id.* at 4.

24.    And often these internal standards are above the limits sets by the FDA. For example, despite the FDA's only "finalized []standard—100 ppb inorganic arsenic in infant rice cereal—Nurture set its internal standard for that product 15% higher than the FDA limit, at 115 ppb." *Id.* at 33.

25.    Indeed, while "Nurture created internal standards" (which it dubs "goal thresholds"), it does not follow them. *Id.* These "thresholds" are essentially meaningless because they "are not used to make product disposition decisions and are not a pre-condition to product release." *Id.* As the Subcommittee concluded, "[b]y company policy [then], Nurture's toxic heavy metal testing is not intended for consumer safety." *Id.* at 4. "Instead, its testing regime is limited to monitoring the supply chain. Nurture's thresholds are not actually used to prevent products that contain high levels of toxic heavy metals from being sold." *Id.* at 33.

26.    Nurture admitted to the Subcommittee that it does not test for safety. *Id.* at 34. "[I]t made clear in its letter its letter response to this Subcommittee that all products will be sold regardless of testing result: 'our heavy metal testing is performed as part of our monitoring program and not as a condition of product release, all of the products that were tested were sold

into commerce.'" *Id.* Given this "policy of not testing for safety," it is no surprise that "Nurture

released products containing as much as 641 ppb lead and 180 ppb inorganic arsenic." *Id.*

| Product Name | Category | Best Before Date | Parameter | Goal Threshold | Result | Unit | Date of Test Report | Disposition |
|---|---|---|---|---|---|---|---|---|
| Apple & Broccoli Puffs | Baby 7+ Months | 9/7/2018 | Inorganic Arsenic | 100 | 180 | ppb | 11/01/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Banana & Pumpkin Puffs | Baby 7+ Months | 10/11/2018 | Inorganic Arsenic | 100 | 160 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Strawberry & Beet Puffs | Baby 7+ Months | 7/24/2018 | Inorganic Arsenic | 100 | 160 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Kale & Spinach Puffs | Baby 7+ Months | 3/16/2019 | Inorganic Arsenic | 100 | 150 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Kale & Spinach Puffs | Baby 7+ Months | 11/16/2018 | Inorganic Arsenic | 100 | 150 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Purple Carrot & Blueberry Puffs | Baby 7+ Months | 2/15/2019 | Inorganic Arsenic | 100 | 150 | ppb | 11/17/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Sweet Potato & Carrot Puffs | Baby 7+ Months | 1/19/2019 | Inorganic Arsenic | 100 | 150 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |

27.     Ultimately, "Nurture sells the products it tests, regardless of their toxic heavy metal

content. In total, Nurture tested 113 final products and sold *every* product tested, regardless of how

much inorganic arsenic or lead the product contained, and regardless of whether those metals

exceeded its own internal standards." *Id.* (emphasis added.)

28.     The Subcommittee also noted that Defendant "appear[ed] to have misled the

Subcommittee about its testing standards. As seen from Nurture's goal thresholds pictured below,

Nurture conveyed to the Subcommittee that after January of 2019, it had a goal threshold of 50

ppb for lead in all of its baby food products— infant formula, cereals, and wet foods[:]

All of our specific goal thresholds for the referenced contaminants[8] are set forth in the chart below.

| Product Type | Contaminant | Analytical Matrix | Goal Threshold | Unit |
|---|---|---|---|---|
| Infant Formula | Cadmium | As Sold | 10 | ppb |
| Infant Formula | Inorganic Arsenic | As Sold | 75 | ppb |
| Infant Formula | Lead | As Sold | 50 | ppb |
| Cereals | Cadmium | As Consumed | 50 | ppb |
| Cereals with <75% Rice | Inorganic Arsenic | As Sold | 100 | ppb |
| Cereals with >75% Rice | Inorganic Arsenic | As Sold | 115 | ppb |
| Cereals | Lead | As Consumed | 50* | ppb |
| Cereals | Mercury | As Consumed | 10 | ppb |
| Wet Foods | Cadmium | As Consumed | 50 | ppb |
| Wet Foods | Inorganic Arsenic | As Sold | 100 | ppb |
| Wet Foods | Lead | As Consumed | 50* | ppb |
| Wet Foods | Mercury | As Consumed | 10 | ppb |

*Threshold lowered from 100ppb to 50ppb in January, 2019.

*Id.* at 35.

29.      However, test results that Nurture provided to the Subcommittee, demonstrated that Defendant was still using 100 ppb (not 50 ppb as promised) as the "goal threshold" for lead. *Id.* at 36.

30.      "The fact that Nurture appears to have continued using a higher standard up to nine months after it claimed to the Subcommittee to have lowered the threshold casts serious doubt on Nurture's candor in this matter." *Id.* at 35.

31.      In its conclusion, the Subcommittee stressed the danger associated with the presence of Heavy Metals in baby food: "These toxic heavy metals pose serious health risks to babies and toddlers. Manufacturers knowingly sell these products to unsuspecting parents, in spite

of internal company standards and test results, and without any warning labeling whatsoever."
*Id.* at 58.

## II.     Perchlorate Presents Additional Serious Risks to Infants and Children

32.     Perchlorate "is a rocket fuel component used since the Cold War."[3] The dangers of
perchlorate in human food are recognized by the FDA.[4] It "disrupts thyroid functions crucial to
brain development," yet "[l]evels in children's food [have] increased dramatically" in recent
years.[5]

33.     Test "results suggest a prevalence that could pose risks during pregnancy and
infancy."[6] One lab "detected it in 19 of 25 foods tested."[7]

34.     Healthy Babies Bright Futures found perchlorates in three of the five of
Defendant's baby food products that it tested.[8]

| Brand | Food | Food type | Perchlorate (ppb) |
|---|---|---|---|
| Happy Baby | Oatmeal Baby Cereal, Clearly Crafted - Organic Whole Grains - for sitting baby | Cereal - oatmeal | 1.6 * |
| Happy Baby | Oats & Quinoa Baby Cereal Organic Whole Grains with Iron - Sitting baby | Cereal - mixed and multi-grain | 2.4 * |
| Happy Baby | Simple Combos Apples, Spinach & Kale - 2 | Fruit and vegetable - mixed | 3.7 |

---

[3]     Healthy    Babies    Bright    Futures    Report,    at    8.    Available    at:
https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-
04/BabyFoodReport_ENGLISH_R6.pdf (last visited Feb. 9, 2021).

[4]     FDA,    Exploratory    Survey    Data    on    Perchlorate    in    Food    2004-2005,
https://www.fda.gov/food/chemicals/exploratory-survey-data-perchlorate-food-2004-2005

[5] Healthy Babies Bright Futures Report, at 8.

[6] *Id.*

[7] *Id.*

[8] *Id.* at Appendix D.

35.     Despite the presence, or ever increasing risk of presence, of Perchlorate in its Contaminated Baby Foods, the cornerstone of Defendant's labels and marketing is its "Natural" ingredients. The presence, or risk of presence, of Perchlorate is directly contrary to Defendant's "Naturals" promise.

III.    **Defendant Falsely Marketed Its Contaminated Baby Foods as Healthy While Omitting Any Mention of Heavy Metals or Perchlorate**

36.     Defendant packages, labels, markets, advertises, formulates, manufactures, distributes, and sells its Contaminated Baby Foods throughout the United States, including New York.

37.     Defendant is aware that parents such as Plaintiff care about the quality and composition of the foods they feed their children. In fact, Defendant claims that food quality is its very reason for existing, asserting on its website "We launched on Mother's Day 2006 as Happy Baby, with the mission to change the trajectory of children's health through nutrition."[9]

38.     Defendant's marketing plays on the protective parenting instincts of Plaintiff and class members, asserting that its "Founder and Chairmom [sic] Shazi Visram… found her purpose: give babies their healthiest, happiest beginning by offering parents organic, thoughtfully-made food."[10]

39.     In its Amazon store, "Happy Baby," Defendant continues to market its products to consumers as "premium" food because of its purported nutritional superiority: "Happy Baby Organics, we provide organic and delicious options for your baby's nutritional journey."[11]

---

[9] https://www.happyfamilyorganics.com/our-story/ (last accessed Feb. 12, 2021).

[10] *Id.*

[11] https://www.amazon.com/stores/page/30673108-4993-4FC0-8677-ECFB41A1C8D6/?_encoding=UTF8&store_ref=SB_A0811471J26V00ZAUXKV&pd_rd_plhdr=t&aaxitk=8MVACsjMt5P-

40.    Despite marketing its products as safe, nutritious, wholesome and trustworthy, Defendant fails to disclose the inclusion of Heavy Metals or Perchlorate altogether on its packaging.

41.    Defendant markets its products according to a child's stage of development, with "Stage 1" products for infants to age 6 months, "Stage 2" solid foods for babies 6 months, and later stage foods for "Tots and Tykes."

42.    Based on Defendant's decision to advertise, label, and market its Contaminated Baby Foods as appropriate for various "stages" of development, it had a duty to ensure that the statements and messaging portrayed on the labels were true and not misleading.

43.    In a section of its website, "Congressional Report FAQs" directed at the Subcommittee's investigation, Defendant asserts that it is "a leader in the industry on rigorous methodology, **routinely testing both our ingredients and finished products** to assure they are safe and healthy for baby" (emphasis in original).[12]

44.    Defendant's claim that it is "routinely testing … to assure they are safe and healthy" is false and misleading, since Defendant admitted to the Subcommittee investigation that it "sold

---

jpQ3vlm6Vg&hsa_cr_id=5063913310501&lp_asins=B00XCLFZZE%2CB01EPQFPHW%2CB0030VJ9UI&lp_mat_key=happy%20family&lp_query=happy%20family&lp_slot=auto-sparkle-hsa-tetris&ref_=sbx_be_s_sparkle_mcd_cta&pd_rd_w=nkskn&pf_rd_p=9c8c2cb0-5e2b-4d3c-ab9c-9390e77a1435&pd_rd_wg=yS7iF&pf_rd_r=297E35QSJ5GJR4ZDZ8RX&pd_rd_r=6d538ae8-f2ad-4556-8c63-5fb8734166ff (last accessed Feb. 12, 2021).

[12] https://www.happyfamilyorganics.com/quality-and-safety-of-our-products/

all products tested, regardless of how much toxic heavy metal the baby food contained" and that its toxic heavy metals testing regiment was "not intended for consumer safety."[13]

45.    As discussed above, the Marketing of the Contaminated Baby Foods during the Class period also failed to disclose that they contain or are at risk or containing any level of Heavy Metals, Perchlorate, or other undesirable toxins or contaminants. Defendant intentionally omitted these contaminants in order to induce and mislead reasonable consumers to purchase its Contaminated Baby Foods.

46.    As a result of Defendant's omissions, a reasonable consumer would have no reason to suspect the presence of Heavy Metals or Perchlorate in the Contaminated Baby Foods without conducting his or her own scientific tests or reviewing third party scientific testing of these products.

**IV.    Defendant's Marketing Misled and Deceived Consumers**

47.    Defendant's Marketing wrongfully conveys to consumers that its Contaminated Baby Foods have certain superior quality and characteristics that they do not actually possess.

48.    For instance, although Defendant misleadingly causes consumers to believe its Contaminated Baby Foods do not contain Heavy Metals or Perchlorate through its Marketing and omissions, the Contaminated Baby Foods do in fact contain undisclosed Heavy Metals, which is material information to reasonable consumers.

49.    For example, the following foods were tested and found to contain undisclosed Heavy Metals at the following levels:[14]

---

[13] Subcommittee investigation at 4.

[14] The following chart represents the levels of Heavy Metals in Defendant's products included in the Healthy Babies Bright Futures Report, dated October 2019. Available at:

| Food | Arsenic (total, ppb) | Arsenic (inorganic, ppb) | Lead (ppb) | Cadmium (ppb) | Mercury (total, ppb) |
|---|---|---|---|---|---|
| Oats & Quinoa Baby Cereal Organic Whole Grains with Iron - Sitting baby | 10.2 | -- | 0.9*[15] | 12.4 | < 0.14 |
| Oatmeal Baby Cereal, Clearly Crafted - Organic Whole Grains - for sitting baby | 6.3* | -- | < 0.5 | 10 | < 0.14 |
| Organic Infant Formula with Iron, Milk Based Powder - 0-12 months | < 4.5 | -- | 3.7 | < 1.1 | < 0.286 |
| Organics Sweet Potatoes - Stage 1 | 5.8* | -- | 1.5* | 1* | < 0.142 |
| Sweet Potatoes - Stage 1 | 27.5 | 29**[16] | 2 | 1.6* | < 0.141 |
| Organic Pears - Stage 1 | 7.4 | -- | 1* | 0.8* | < 0.138 |
| Clearly Crafted Prunes Organic Baby Food, 1, 4+ months | < 2.1 | -- | 2 | < 0.5 | < 0.136 |
| Simple Combos Apples, Spinach & Kale - 2 | 3* | -- | 4.3 | 4.9 | 0.182* |
| Love My Veggies Bowl - Cheese & Spinach Ravioli | 4.8* | -- | 8.5 | 19.6 | 0.148 * |

---

https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf (last accessed Feb. 8, 2021).

[15] An "*" indicates that test results were estimated, between the limit of detection and the limit of quantitation.

[16] "Total arsenic value is higher than inorganic arsenic value but falls within the allowable and expected analytical error. For example, this ratio of inorganic to total arsenic of 105% falls within the FDA method for arsenic speciation in rice, which allows this ratio to range from 65 – 135%." https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf (last accessed Feb. 18, 2021).

| Food | Arsenic (total, ppb) | Arsenic (inorganic, ppb) | Lead (ppb) | Cadmium (ppb) | Mercury (total, ppb) |
|------|------|------|------|------|------|
| with Organic Marinara Sauce - for tots and tykes | | | | | |
| Apples, Sweet Potatoes & Granola Clearly Crafted Organic Baby Food - 2 | 3.6 * | -- | 5.2 | 1.5 * | < 0.142 |
| Superfood Puffs - Apple & Broccoli Organic Grain Snack - for crawling baby | 266 | 83 | 8.2 | 11 | 2.16 |
| Superfood Puffs Organic Grain Snack - Sweet Potato & Carrot | 295 | 91 | 3.7 | 12.2 | 1.94 |
| Organic Rice Cakes Puffed Rice Snack - Apple | 455 | 47 | 1.7 | 5.4 | 3.18 |
| Organic Teethers Blueberry & Purple Carrot - Sitting baby | 67 | -- | 6 | 8.2 | 2.26 |

50.     Defendant's Marketing wrongfully fails to disclose to consumers the presence of Heavy Metals and Perchlorate in its Contaminated Baby Foods.

51.     Based on Defendant's Marketing, a reasonable consumer would not suspect the presence of Heavy Metals or Perchlorate, nor would a reasonable consumer be able to detect the presence of Heavy Metals or Perchlorate in the Contaminated Baby Foods without conducting his or her own scientific tests or reviewing scientific testing conducted on the Products.

52.     Reasonable consumers must and do rely on Defendant to honestly report what its Contaminated Baby Foods contain.

53.    In light of Defendant's Marketing, including its "strict, self-imposed quality standards,"[17] Defendant knew or should have known the Contaminated Baby Foods contained Heavy Metals and Perchlorate.

54.    Defendant intended for consumers to rely on its Marketing, and reasonable consumers did in fact so rely.

55.    Defendant had a duty to ensure the Contaminated Baby Foods were as they were represented and not deceptively, misleadingly, unfairly, and falsely marketed.

56.    Pursuant to the foregoing, Defendant's Marketing is deceptive, misleading, unfair, and false to Plaintiff and other consumers, including under the consumer protection laws of California.

57.    Defendant acted negligently, recklessly, unfairly, and/or intentionally with its deceptive, misleading, unfair, and false Marketing and omissions.

## V.    Why Defendant's Marketing and Omissions are Misleading

58.    At all times during the Class Period, Defendant knew or should have known the Contaminated Baby Foods contained Heavy Metals and Perchlorate and were not sufficiently tested for the presence of Heavy Metals and Perchlorate.

59.    Defendant's Contaminated Baby Foods had a risk of containing Heavy Metals and Perchlorate due to Defendant's failure to monitor for their presence in the ingredients and finished products, and Defendant's use of ingredients that exceed its own lax internal guidelines for some Heavy Metals. Defendant was aware of this risk and failed to disclose it to Plaintiff and the Class.

---

[17] https://www.happyfamilyorganics.com/quality-and-safety-of-our-products/ (last accessed Feb. 12, 2021).

60.    Defendant knew that Heavy Metals and Perchlorate are potentially dangerous contaminants that poses health risks to humans.

61.    Defendant knew or should have known that it owed consumers a duty of care to prevent, or at the very least, minimize the presence of Heavy Metals and Perchlorate in the Contaminated Baby Foods to the extent reasonably possible.

62.    Defendant knew or should have known it owed consumers a duty of care to adequately test for Heavy Metals and Perchlorate in the Contaminated Baby Foods.

63.    Defendant knew consumers purchased the Contaminated Baby Foods based on the reasonable expectation that Defendant manufactured the Contaminated Baby Foods to the highest standards. Based on this expectation, Defendant knew or should have known consumers reasonably inferred that Defendant would hold the Contaminated Baby Foods to the highest standards for preventing the inclusion of Heavy Metals and Perchlorate in the Contaminated Baby Foods and for the Heavy Metals and Perchlorate testing of the ingredients in the Contaminated Baby Foods as well as the final product.

64.    Arsenic is an odorless and tasteless element that does not degrade or disappear. Arsenic occurs in the environment and can be found in rocks, soil, water, air, plants, and animals. Inorganic arsenic is highly toxic and a known cause of human cancers. Arsenic exposure can also cause respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological effects, and damage children's central nervous systems and cognitive development. Ex. 1 at 9-10. Based on the risks associated with exposure to higher levels of arsenic, both the U.S. Environmental Protection Agency ("EPA") and U.S. Food and Drug Administration ("FDA") have set limits concerning the allowable limit of arsenic at 10 parts per billion ("ppb")

for human consumption in apple juice (regulated by the FDA) and drinking water (regulating by the EPA).

65.    Defendant tests its final product for arsenic, but "[a]ccording to internal company documents, Nurture sells products even after testing confirms that they are dangerously high in inorganic arsenic." Ex. 1 at 13-14. In fact, "Nurture sold one such product, Apple and Broccoli Puffs, despite tests results showing it contained 180 ppb inorganic arsenic. An arsenic level of 180 ppb is high by all standards, but it is 80% higher than Nurture's *own* internal goal threshold of 100 ppb." *Id.* at 14 (emphasis added).

**Nurture's Heavy Metal Test Results for Baby Food Products (Excerpted Entries)[34]**

| Product Name | Category | Best Before Date | Parameter | Goal Thresh old | Result | | Unit | Date of Test Report | Disposition |
|---|---|---|---|---|---|---|---|---|---|
| Apple & Broccoli Puffs | Baby 7+ Months | 9/7/2018 | Inorganic Arsenic | 100 | 180 | 180 | ppb | 11/01/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Banana & Pumpkin Puffs | Baby 7+ Months | 10/11/2018 | Inorganic Arsenic | 100 | 160 | 160 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Strawberry & Beet Puffs | Baby 7+ Months | 7/24/2018 | Inorganic Arsenic | 100 | 160 | 160 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |

66.    The testing result for Apple and Broccoli Puffs was not an outlier.  "Nurture routinely sold products that exceeded its internal standards. Twenty-nine other products that Nurture tested and sold registered over 100 ppb inorganic arsenic." *Id.* And "[i]n total, over 25% of the products that Nurture tested for inorganic arsenic, and sold, had inorganic arsenic levels above 100 ppb." *Id.*

67.    "The average amount of inorganic arsenic in the baby foods that Nurture tested and sold was 59.54 ppb. That towers over existing and recommended standards, including FDA's and EPA's water limits of 10 ppb." *Id.*

68.    "At least 89 of Nurture's final products—over 78% of those products tested—tested at 9 ppb inorganic arsenic or above." *Id.*

69.     "For results under 9.54 ppb, Nurture did not differentiate—it marked them all as '<9.54.'" *Id.* As a result of this "'less than' reporting format, there is no way to know if any of Nurture's products were free of inorganic arsenic." *Id.*

70.     In summary, as the Subcommittee investigation concluded:

**Summary of Nurture's Inorganic Arsenic Results**

| |
|---|
| **180 ppb – Nurture's product with the highest amount of inorganic arsenic:  Apple & Broccoli Puffs.** |
| **>100 ppb – Over 25% of the baby food products that were tested for inorganic arsenic had over 100 ppb inorganic arsenic.** |
| **59.54 ppb – Average amount of inorganic arsenic in all baby food products tested for inorganic arsenic.** |
| **>50 ppb – Over 50% of Nurture's baby food products that were tested for inorganic arsenic contained over 50 ppb inorganic arsenic.** |

71.     Lead is a carcinogen and developmental toxin known to cause health problems in children such as behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth. Because lead can build up in the body over time as one is exposed to and/or ingests it, even a low level of chronic exposure can become toxic and seriously injurious to one's health. The FDA has set standards that regulate the maximum parts per billion of lead permissible in water: bottled water cannot contain more than 5 ppb of total lead or 10 ppb of total arsenic. *See* 21 C.F.R. § 165.110(b)(4)(iii)(A).

72.     The Subcommittee's investigation found that baby food manufacturers, like Defendant, "are selling baby food with higher levels of lead than what is allowed by existing standards for water, juice, and candy." Ex. 1 at 22.

73.     Defendant's internal limit for lead is 100 ppb. However, it "sold products that tested as high as 641 ppb lead—over six times higher than its internal limit." *Id.* "Nurture also sold five other products after they tested over 50 ppb lead." *Id.*

| Product Name | Category | Best Before Date | Parameter | Goal Threshold | Result | Unit | Date of Test Report | Disposition |
|---|---|---|---|---|---|---|---|---|
| Blueberry Purple Carrot | Baby 7+ Months | 10/25/2017 | Lead | 100 | 641 | ppb | 01/27/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Multi-Grain Cereal | Baby 6+ Months | 11/16/2018 | Lead | 100 | 580 | ppb | 08/30/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Apple Spinach Kiwi Cre Canister | Baby 7+ Months | 8/4/2018 | Lead | 100 | 86 | ppb | 07/28/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Blueberry Beet Rice Ca | Baby 7+ Months | 5/22/2018 | Lead | 100 | 61 | ppb | 07/28/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Pea Spinach Teether | Baby 7+ Months | 10/24/2019 | Lead | 100 | 55 | ppb | 12/12/18 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Pea Spinach Teether | Baby 7+ Months | 05/07/2019 | Lead | 100 | 50 | ppb | 12/12/18 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |

74.     Overall, Nurture's products registered high for lead. "Of the 206 finished products that Nurture tested for lead, 16 products registered over 20 ppb lead—exceeding the lenient EU standard," the FDA's 5 ppb standard for lead in bottled water, and the [the] EPA's 15 ppb action level of drinking water. *Id.* at 23. "And 39 products, or 18.9%, tested over 10 ppb lead. It is not clear that even one of Nurture's baby food products registered at or below 1 ppb lead, which should be the upper limit for lead content according to the health experts at Consumer Reports, the Environmental Defense Fund, and the American Academy of Pediatrics." *Id.* at 23.

75.     Cadmium is associated with decreases in IQ and the development of ADHD. The U.S. Department of Health and Human Services has determined that cadmium and cadmium compounds are known human carcinogens and the EPA has likewise determined that cadmium is a probable human carcinogen. It has been specifically noted that "Kidney and bone effects have … been observed in laboratory animals ingesting cadmium."

76.     The Subcommittee investigation determined that Defendant "sold multi-grain cereal with 49 ppb cadmium," (well over the EU's lax infant formula upper limit of 20 ppb cadmium), and "125 products that tested over 5 ppb, which is the EPA's limit for drinking water." *Id.* at 29.

| Product Name | Category | Best Before Date | Parameter | Goal Threshold | Result | Unit | Date of Test Report | Disposition |
|---|---|---|---|---|---|---|---|---|
| Multi-Grain Cereal Canister | Baby 6+ Months | 11/16/2018 | Cadmium | 50 | 49 | ppb | 08/30/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Strawberry Raspberry | Baby 7+ Months | 1/18/2019 | Cadmium | 50 | 36 | ppb | 12/06/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Kale & Spinach Puffs | Baby 7+ Months | 12/4/2020 | Cadmium | 50 | 35 | ppb | 10/09/19 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Strawberry Raspberry | Baby 7+ Months | 11/10/2019 | Cadmium | 50 | 31 | ppb | 10/23/18 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Strawberry Raspberry | Baby 7+ Months | 11/10/2019 | Cadmium | 50 | 30 | ppb | 10/31/18 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |

77.    Mercury is a known toxin, and pre-natal exposure has been associated with affected neuro-development, a lowered IQ, and autistic behaviors. The impact of the various ways humans and animals are exposed and ingest mercury has been studied for years. In fact, in as early as 1997, the EPA issued a report to Congress that detailed the health risks to both humans and animals. Based on the toxicity and risks of mercury, regulations have been enacted at both the Federal and state level.

78.    "Nurture sold a finished baby food product that contained 10 ppb mercury, and two others that contained 9.8 and 7.3 ppb. A level of 10 ppb is five times more than the EPA's 2 ppb standard for drinking water. In total, Nurture sold 56 products that contained over 2 ppb mercury." Ex. 1 at 32.

| Product Name | Category | Best Before Date | Parameter | Goal Threshold | Result | Unit | Date of Test Report | Disposition |
|---|---|---|---|---|---|---|---|---|
| Brown Rice Cereal Canister | Baby 6+ Months | 08/16/2019 | Mercury | 10 | 10 | ppb | 08/20/18 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Banana Sweet Potato Te | Baby 7+ Months | 6/3/2019 | Mercury | 10 | 9.8 | ppb | 04/16/18 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Brown Rice Cereal Canister | Baby 6+ Months | 04/17/2019 | Mercury | 10 | 7.3 | ppb | 12/04/18 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |

79.    While federal regulations regarding levels of Heavy Metals in most baby foods are non-existent, it is not due to a lack of risk. According to Linda McCauley, Dean of the Nell Hodgson Woodruff School of Nursing at Emory University, who studies environmental health

effects, stated, "No level of exposure to these [heavy] metals has been shown to be safe in vulnerable infants."[18]

80.     Based on the foregoing, reasonable consumers, like Plaintiff, would consider the inclusion of Heavy Metals and Perchlorate a material fact when considering what baby food to purchase.

81.     Defendant knew that properly and sufficiently monitoring for Heavy Metals and Perchlorate in its ingredients and Contaminated Baby Foods was not only important but critical.

82.     Defendant also knew that monitoring Heavy Metals and Perchlorate was likewise important to its health-conscious consumers.

83.     Finally, Defendant knew or should have known it could control the levels of Heavy Metals and Perchlorate in the Contaminated Baby Foods by properly monitoring its ingredients for Heavy Metals and Perchlorate and adjusting any formulation or diet to reduce ingredients that contained higher levels of Heavy Metals and Perchlorate.

84.     However, Defendant also knew it was not properly and sufficiently testing for Heavy Metals and Perchlorate in the Contaminated Baby Foods. Defendant knew its failure to properly and sufficiently test for Heavy Metals and Perchlorate in the Contaminated Baby Foods continued throughout the Class Period.

85.     Defendant's Marketing was misleading due to its failure to properly and sufficiently monitor for and to disclose the risk of the presence of Heavy Metals and Perchlorate in the Contaminated Baby Foods.

---

[18] https://www.nytimes.com/2021/02/04/health/baby-food-metals-arsenic.html (last accessed Feb. 9, 2021).

86.    Defendant knew or should have known consumers paid premium prices and expected Defendant to regularly test for Heavy Metals and Perchlorate and sufficiently monitor the presence of Heavy Metals and Perchlorate in the Contaminated Baby Foods and ingredients.

87.    At all times during the Class Period, Defendant did not consistently monitor or test for Heavy Metals and Perchlorate in the Contaminated Baby Foods and ingredients.

88.    Defendant knew or should have known that consumers reasonably expected it to test for and monitor the presence of Heavy Metals and Perchlorate in the Contaminated Baby Foods and ingredients.

89.    Defendant knew or should have known the Contaminated Baby Foods contained unmonitored levels of Heavy Metals and Perchlorate that were inconsistent with their Marketing.

90.    Defendant knew or should have known that consumers expected it to ensure the Contaminated Baby Foods were monitored and tested for Heavy Metals and Perchlorate to ensure compliance with their Marketing.

91.    Defendant knew, yet failed to disclose, its lack of regular testing and knowledge of the risk or presence of Heavy Metals and Perchlorate in the Contaminated Baby Foods and ingredients.

92.    Defendant's above-referenced statements, representations, partial disclosures, and omissions are false, misleading, and crafted to deceive the public as they create an image that the Contaminated Baby Foods are healthy, nutritious, and made from the best ingredients, are subject to stringent quality control, and are free of Heavy Metals and Perchlorate.

93.    Moreover, reasonable consumers, such as Plaintiff and the Class members, would have no reason to doubt Defendant's statements regarding the quality of the Contaminated Baby Foods. Defendant's nondisclosure and/or concealment of the toxins in the Contaminated Baby

Foods coupled with the misrepresentations alleged herein that were intended to and did, in fact, cause consumers like Plaintiff and the members of the Class, to purchase products they would not have if the true quality and ingredients were disclosed or would not have paid a premium price for such baby food.

94.    As a result of Defendant's wrongful Marketing, which includes misleading, deceptive, unfair, and false statements and omissions, Defendant has generated substantial sales of the Contaminated Baby Foods.

95.    Defendant's wrongful Marketing, which includes misleading, deceptive, unfair, and false representations and omissions, allowed it to capitalize on, and reap enormous profits from, consumers who paid the purchase price or premium for the Products that were not as advertised.

96.    This is not surprising given that, for example, that the baby food market in the United States was valued at $12.9 billion in 2018 and was expected to increase to $17.2 billion by 2026,[19] and organic baby food was valued at $1.9 billion in the U.S. in 2018 and is expected to reach $3.32 billion by 2024.[20]

97.    The incredible rise in consumer demand for organic baby food is "driven by the growing awareness among consumers to limit that baby's exposure to the harmful chemicals used in conventional food production and the awareness of the benefits of organic products."[21]

---

[19]    https://www.globenewswire.com/news-release/2020/01/16/1971596/0/en/U-S-Baby-Food-Market-by-Product-Type-and-Distribution-Channel-Opportunity-Analysis-and-Industry-Forecast-2019-2026.html (last accessed Feb. 9, 2021).

[20]    https://www.businesswire.com/news/home/20200120005436/en/North-America-Organic-Baby-Food-Market-Expected-to-Reach-a-Value-of-3.32-Billion-by-2024-with-a-CAGR-of-9.6---ResearchAndMarkets.com (last accessed Feb. 8, 2021).

[21]    https://www.mordorintelligence.com/industry-reports/organic-baby-food-market (last accessed Feb. 9, 2021).

## DEFENDANT'S STATEMENTS AND OMISSIONS VIOLATE NEW YORK LAWS

98.    New York law is designed to ensure that a company's claims about its products are truthful and accurate.

99.    Defendant violated New York law by negligently, recklessly, and/or intentionally incorrectly claiming that the Contaminated Baby Foods are healthy, nutritious, and appropriate for various "stages" of development, and by not accurately detailing that the products contain Heavy Metals and Perchlorate.

100.    Defendant's marketing and advertising campaign has been sufficiently lengthy in duration, and widespread in dissemination, that it would be unrealistic to require Plaintiff to plead relying upon each advertised misrepresentation.

101.    Defendant has engaged in this long-term advertising campaign to convince potential customers that the Contaminated Baby Foods were healthy, nutritious, and appropriate for various "stages" of development, and did not contain harmful ingredients, such as Heavy Metals and Perchlorate.

## PLAINTIFF'S RELIANCE WAS REASONABLE AND FORESEEN BY DEFENDANT

102.    Plaintiff reasonably relied on Defendant's claims, warranties, representations, advertisements, and other marketing concerning the particular qualities and benefits of the Contaminated Baby Food.

103.    Plaintiff read and relied upon the labels and packaging of the Contaminated Baby Foods when making her purchasing decisions. Had she known Defendant omitted the presence of Heavy Metals and Perchlorate from its packaging, she would not have purchased it.

104.    A reasonable consumer would consider the labeling of a product when deciding whether to purchase. Here, Plaintiff relied on the specific statements and omissions on the

Contaminated Baby Foods' labeling that led her to believe it was healthy, nutritious, and free of Heavy Metals and Perchlorate.

## DEFENDANT'S KNOWLEDGE AND NOTICE OF ITS BREACHES OF ITS EXPRESS AND IMPLIED WARRANTIES

105.    Defendant had sufficient notice of its breaches of express and implied warranties. Defendant has, and had, exclusive knowledge of the physical and chemical make-up of the Contaminated Baby Foods. Moreover, Defendant was put on notice by the Healthy Babies Bright Future Report about the inclusion of Heavy Metals, Perchlorate, or other undesirable toxins or contaminants in the Contaminated Baby Foods.[22]

## PRIVITY EXISTS WITH PLAINTIFF AND THE PROPOSED CLASS

106.    Defendant knew that consumers such as Plaintiff and the proposed Class would be the end purchasers of the Contaminated Baby Foods and the target of its advertising and statements.

107.    Defendant intended that the warranties, advertising, labeling, statements, and representations would be considered by the end purchasers of the Contaminated Baby Foods, including Plaintiff and the proposed Class.

108.    Defendant directly marketed to Plaintiff and the proposed Class through statements on its website, labeling, advertising, and packaging.

109.    Plaintiff and the proposed Class are the intended beneficiaries of the expressed and implied warranties.

---

[22] Nonprofit organization, Healthy Babies Bright Futures, published a report based on a scientific study of the presence of Heavy Metals in baby foods. https://www.healthybabyfood.org/sites/healthybabyfoods.org/files/2020-04/BabyFoodReport_ENGLISH_R6.pdf (last accessed Feb. 9, 2021).

## CLASS ACTION ALLEGATIONS

110.    Plaintiff brings this action individually and on behalf of the following Class pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

> All persons who, from February 10, 2015, to the present, purchased the Contaminated Baby Foods for household or business use, and not for resale (the "Class").

111.    Plaintiff also brings this action individually and on behalf of the following Subclass pursuant to Rules 23(a) and 23(b)(2) and (3) of the Federal Rules of Civil Procedure:

> All persons who are citizens of Minnesota who, from February 10, 2015, to the present, purchased the Contaminated Baby Foods for household or business use, and not for resale (the "Minnesota Class" or "Subclass").

112.    Excluded from the Class and Subclass (collectively, "Classes") is the Defendant; any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, and employees; co-conspirators; all governmental entities; and any judge, justice, or judicial officer presiding over this matter.

113.    This action is brought and may be properly maintained as a class action. There is a well-defined community of interests in this litigation and the members of the Class are easily ascertainable.

114.    The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of the members of all Classes in a single action will provide substantial benefits to the parties and Court.

115.    Questions of law and fact common to Plaintiff and the Class include, but are not limited to, the following:

a)      whether Defendant owed a duty of care;

b)      whether Defendant knew or should have known that the Contaminated Baby Foods contained Heavy Metals and Perchlorate;

31

c)      whether Defendant represented and continue to represent that the Contaminated Baby Foods are healthy, nutritious, made from the best ingredients, appropriate for various "stages" of development, and safe for consumption;

d)      whether Defendant represented and continues to represent that the manufacturing of its Products is subjected to rigorous quality standards;

e)      whether Defendant failed to disclose that the Contaminated Baby Foods contained Heavy Metals and Perchlorate;

f)      whether Defendant's representations in advertising, warranties, packaging, and/or labeling are false, deceptive, and misleading;

g)      whether those representations are likely to deceive a reasonable consumer;

h)      whether Defendant had knowledge that those representations were false, deceptive, and misleading;

i)      whether Defendant continues to disseminate those representations despite knowledge that the representations are false, deceptive, and misleading;

j)      whether a representation that a product is healthy, nutritious, made from the best ingredients, appropriate for various "stages" of development, and safe for consumption and does not contain Heavy Metals or Perchlorate is material to a reasonable consumer;

k)      whether Defendant's Marketing of the Contaminated Baby Foods are likely to mislead, deceive, confuse, or confound consumers acting reasonably;

l)      whether Defendant violated the New York and/or Minnesota state laws; and

m)      whether Plaintiff and the members of the Class are entitled to declaratory and injunctive relief.

116.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff individually and on behalf of the other members of the Class. Identical statutory violations and business practices and harms are involved. Individual questions, if any, are not prevalent in comparison to the numerous common questions that dominate this action.

117.    Plaintiff's claims are typical of those of the members of the Class in that they are based on the same underlying facts, events, and circumstances relating to Defendant's conduct.

118.    Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

119.    Class treatment is superior to other options for resolution of the controversy because the relief sought for each member of the Class is small such that, absent representative litigation, it would be infeasible for members of the Class to redress the wrongs done to them.

120.    Questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

121.    As a result of the foregoing, class treatment is appropriate.

## **COUNT I**

**Negligent Misrepresentation Against Defendant on Behalf of the Class, or alternatively the Subclass pursuant to state law**

122.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.    Plaintiff reasonably placed her trust and reliance in Defendant's representations that the Contaminated Baby Foods were as Marketed to her and the Class, and were healthy, nutritious,

made from the best ingredients, appropriate for various "stages" of development, and safe for consumption, and did not contain Heavy Metals and Perchlorate.

124.    Because of the relationship between the parties, the Defendant owed a duty to use reasonable care to impart correct and reliable disclosures concerning the presence of Heavy Metals and Perchlorate in the Contaminated Baby Foods or, based upon its superior knowledge, having spoken, to say enough to not be misleading.

125.    Defendant breached its duty to Plaintiff and the Class by providing false, misleading, and/or deceptive information regarding the nature of the Contaminated Baby Foods.

126.    Plaintiff and the Class reasonably and justifiably relied upon the information supplied to them by the Defendant. A reasonable consumer would have relied on Defendant's own warranties, statements, representations, advertising, packaging, labeling, and other marketing as to the quality, make-up, and included ingredients of the Contaminated Baby Foods.

127.    As a result of these misrepresentations, Plaintiff and the Class purchased the Contaminated Baby Foods at a premium.

128.    Defendant failed to use reasonable care in its communications and representations to Plaintiff and the Class, especially in light of its knowledge of the risks and importance of considering ingredients to consumers when purchasing the Contaminated Baby Foods.

129.    By virtue of Defendant's negligent misrepresentations, Plaintiff and the Class have been damaged in an amount to be proven at trial or alternatively, seek rescission and disgorgement under this Count.

## COUNT II

**Violations of New York's Deceptive Acts and Practices, N.Y. Gen. Bus. Law
§ 349, Against Defendant on Behalf of the Class or alternatively the Subclass
pursuant to state law**

130.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131.    New York General Business Law § 349 prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

132.    In its sale of goods throughout New York, Defendant conducts business and trade within the meaning and intendment of New York General Business Law § 349.

133.    Defendant violated N.Y. Gen. Bus. Law. § 349 by representing that its Contaminated Baby Foods were healthy, nutritious and safe baby foods as promised, which was deceptive because the Contaminated Baby Foods instead had a risk of and/or actual inclusion of Heavy Metals and Perchlorate, including levels that exceed FDA and EPA guidance.

134.    Defendant intentionally represented that the Contaminated Baby Foods were of a particular standard, grade, or quality when they in fact had a risk and/or actual inclusion of Heavy Metals and Perchlorate and were not safe for consumption.

135.    The facts that Defendant concealed or misrepresented were material in that any Plaintiff and any other reasonable consumer would have considered them when deciding whether to purchase the Contaminated Baby Foods.

136.    Defendant's conduct and omissions described herein repeatedly occurred in the course of Defendant's business and were capable of deceiving a substantial portion of the consuming public.

137.    Defendant has engaged and continues to engage in deceptive conduct in violation of the New York General Business Law.

35

138.    Defendant's misrepresentations and deceptive acts or practices resulted in Plaintiff and other reasonable consumers suffering actual damages when they purchased the Contaminated Baby Foods that were worth less than the price paid and that they would not have purchased at all had they known of the risk and/or actual inclusion of Heavy Metals and Perchlorate.

139.    Defendant intended for Plaintiff and other reasonable consumers to rely on its deceptive misrepresentations and conduct when purchasing its Contaminated Baby Foods.

140.    As a direct and proximate result of these violations, Plaintiff and other reasonable consumers have been harmed, and that harm will continue unless Defendant is enjoined from misrepresenting the quality and ingredients of its Contaminated Baby Foods described herein.

141.    Pursuant to N.Y. Gen. Bus. Law § 349(h), Plaintiff and the Class and/or Subclass seek injunctive and declaratory relief, full refund, actual and punitive damages, and attorneys' fees.

## COUNT III

### Violations of New York False Advertising Law, N.Y. Gen. Bus. Law § 350, Against Defendant on Behalf of the Class or alternatively the Subclass pursuant to state law

142.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

143.    New York General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

144.    Pursuant to N.Y. Gen. Bus. Law § 350, false advertising is defined as "advertising, including labeling, or a commodity… if such advertising is misleading in a material respect."

145.    Defendant's claims that the Contaminated Baby Foods were healthy, nutritious and safe baby foods as promised were untrue or misleading because such claims failed to disclose that the Contaminated Baby Foods instead had a risk of and/or actual inclusion of Heavy Metals and Perchlorate, including levels that exceed FDA and EPA guidance.

36

146. Defendant knew or should have known that such claims were false or misleading.

147. Such false and misleading claims and representations made by Defendant were material in that Plaintiff and any reasonable consumer would have considered them when deciding to purchase the Contaminated Baby Foods.

148. Defendant, including its agents and distributors, made untrue, deceptive, and misleading assertions and representations about the alleged quality, characteristics, and nature of the Contaminated Baby Foods.

149. Defendant's conduct caused Plaintiff and the Class to suffer actual damages when they purchased the Contaminated Baby Foods that were worth less than the price paid and that they would not have purchased at all had they known of the risk and/or actual inclusion of Heavy Metals and Perchlorate, including levels that exceed FDA and EPA guidance.

150. As a direct and proximate result of Defendant's violation of N.Y. Gen. Bus. Law § 350, Plaintiff and the Class have been injured, and that harm will continue unless Defendant is enjoined from misrepresenting the quality, ingredients, standards, and suitability for consumption of its Contaminated Baby Foods.

151. Pursuant to N.Y. Gen. Bus. Law § 350, *et seq.*, Plaintiff and the Class and/or Subclass seek injunctive and declaratory relief, full refund, actual and punitive damages, and attorneys' fees.

## COUNT IV

**Violation of Minnesota Unlawful Trade Practices Act Minn. Stat. § 325D.09, *et seq*.,
Against Defendant on Behalf of the Class, or
alternatively, the Subclass pursuant to state law**

152. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

153.    Defendant is a "person" within the meaning of the Minnesota Unlawful Trade Practices Act ("MUTPA").

154.    Defendant violated the MUTPA by knowingly misrepresenting the true quality and ingredients of the Contaminated Baby Foods by falsely claiming that they are nutritious, healthy, and safe baby foods as promised, but instead had a risk of and/or actual inclusion of Heavy Metals, including levels that exceed FDA and EPA guidance.  Such misrepresentations were intended to and did, in fact, cause consumers like Plaintiff and the Class members to purchase the Contaminated Baby Foods they would not have if the true quality and ingredients had been disclosed.

155.    Defendant knew or should have known the Contaminated Baby Foods did not have the quality and ingredients described above because they contained and/or had a material risk of containing, heavy metals or any other ingredients or contaminants that do not conform to the packaging claims.

156.    Defendant's pattern of knowing misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff and the Class with respect to the Contaminated Baby Foods' quality, ingredients, and suitability for consumption.

157.    Defendant intended that Plaintiff and the Class would rely on its misrepresentations, concealment, warranties, deceptions, and/or omissions regarding the Contaminated Baby Foods' quality, ingredients, and suitability for consumption.

158.    Defendant's conduct and omissions described herein occurred repeatedly in its trade or business and were capable of deceiving a substantial portion of the consuming public.

159.    The facts concealed or not disclosed by Defendant were material facts in that Plaintiff and any reasonable consumer would have considered them in deciding whether to purchase the Contaminated Baby Foods.  Had Plaintiff known the Contaminated Baby Foods did not have the quality and ingredients advertised by Defendants, they would not have purchased the Contaminated Baby Foods.

160.    Defendant's unlawful conduct is continuing, with no indication that Defendant intend to cease this fraudulent course of conduct.

161.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they purchased the Contaminated Baby Foods that were worth less than the price they paid.

162.    Plaintiff and the members of the Class would not have purchased the Contaminated Baby Foods had they known of the presence of these non-conforming ingredients, contaminants, and/or unnatural or other ingredients.

163.    Pursuant to Minn. Stat. § 8.31, subd. 3a, and § 325D.15, Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendant's violations of the MUTPA.

## COUNT V

**Violation of Minnesota Uniform Deceptive Trade Practices Act**
**Minn. Stat. § 325D.43, *et seq*., Against Defendant on Behalf of the Class, or**
**alternatively the Subclass pursuant to state law**

164.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

165.    Defendant is a "person" within the meaning of the Minnesota Uniform Deceptive Trade Practices Act (MUDTPA).

166.    Defendant willingly engaged in deceptive trade practices, in violation of the MUDTPA, by knowingly misrepresenting the true quality and ingredients of the Contaminated Baby Foods by falsely claiming the Contaminated Baby Foods are nutritious, safe, are subject to food safety and quality standards that exceed government requirements, and by failing to make any mention of Heavy Metals in the Contaminated Baby Foods.

167.    Defendant knew or should have known the Contaminated Baby Foods did not have the quality and ingredients described above because they contained, and/or had a material risk of containing, heavy metals or any other ingredients or contaminants that do not conform to the packaging claims.

168.    Defendant's misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff and the Class with respect to the Contaminated Baby Foods' ingredients, uses, benefits, standards, quality, grade, and suitability for consumption.

169.    Defendant's intended that Plaintiff and the Class would rely on Defendant's misrepresentations, concealment, warranties, deceptions, and/or omissions regarding the Contaminated Baby Foods' ingredients, uses, benefits, standards, quality, grade, and suitability for consumption.

170.    The facts concealed or not disclosed by Defendant were material facts in that Plaintiff and any reasonable consumer would have considered them in deciding whether to purchase the Contaminated Baby Foods.  Had Plaintiff known the Contaminated Baby Foods did not have the quality and ingredients advertised by Defendant, she would not have purchased the Contaminated Baby Foods.

171.    Defendant intended that Plaintiff and the Class would rely on the deception by purchasing the Contaminated Baby Foods, unaware of the undisclosed material facts. This conduct constitutes consumer fraud.

172.    Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this fraudulent course of conduct.

173.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they purchased the Contaminated Baby Foods that were worth less than the price they paid.

174.    Plaintiff and the members of the Class would not have purchased the Contaminated Baby Foods at all had they known of the presence of these Heavy Metals, contaminants, and/or unnatural or other ingredients.

175.    Pursuant to Minn. Stat. § 325D.45, Plaintiff and the Class seek injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendants' violations of the MUDTPA.

## COUNT VI
### Violation of Minnesota False Statement in Advertisement Act
### Minn. Stat. § 325F.675, *et seq*., Against Defendant on Behalf of the Class, or alternatively the Subclass pursuant to state law

176.    Plaintiff incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

177.    Plaintiff purchased "goods," specifically the Contaminated Baby Foods discussed herein, and is a "person" within the meaning of the False Statement in Advertising Act (FSAA).

178.    Plaintiff purchased the Contaminated Baby Foods through Defendant's statements and materials omissions on the packaging that contained numerous material assertions

representations, and statements of fact made, published, disseminated, circulated, and placed before the public by Defendant that were untrue, deceptive, and misleading.

179.    By engaging in the conduct herein, Defendant violated and continues to violate Minn. Stat. § 325F.67.

180.    Defendant's misrepresentations, knowing omissions, and use of other sharp business practices include, by way of example, representations that the Contaminated Baby Foods are nutritious, safe, are subject to food safety and quality standards that exceed government requirements, and by failing to make any mention of Heavy Metals in the Contaminated Baby Foods.

181.    As a result of Defendant's misrepresentations, Plaintiff and the Class purchased the Contaminated Baby Foods that they would not have purchased had they known of the risk and/or actual inclusion of Heavy Metals, including levels that exceed FDA and EPA guidance.

182.    Defendant knew or should have known the Contaminated Baby Foods did not have the quality and ingredients described above because they contained, and/or had a material risk of containing, heavy metals and/or any other ingredients or contaminants that do not conform to the packaging claims.

183.    Defendant's misrepresentations, concealment, omissions, and other deceptive conduct were likely to deceive or cause misunderstanding and did in fact deceive Plaintiff and the Class with respect to the Contaminated Baby Foods' ingredients, uses, benefits, standards, quality, grade, and suitability for consumption.

184.    Defendant's conduct and omissions described herein occurred repeatedly in Defendant's trade or business and were capable of deceiving a substantial portion of the consuming public.

185.    The facts concealed or not disclosed by Defendant were material facts in that Plaintiff and any reasonable consumer would have considered them in deciding whether to purchase the Contaminated Baby Foods.  Had Plaintiff known the Contaminated Baby Foods did not have the quality and ingredients advertised by Defendant, she would not have purchased the Contaminated Baby Foods.

186.    Defendant intended that Plaintiff and the Class would rely on the deception by purchasing the Contaminated Baby Foods, unaware of the undisclosed material facts. This conduct constitutes consumer fraud.

187.    Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this fraudulent course of conduct.

188.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they purchased the Contaminated Baby Foods that were worth less than the price they paid.

189.    Plaintiff and the members of the Class would not have purchased the Contaminated Baby Foods at all had they known of the presence of these non-conforming ingredients, contaminants, and/or unnatural or other ingredients.

190.    Pursuant to Minn. Stat. § 8.31, subd. 3a, and § 325F.67, Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendants' violations of the FSAA.

### COUNT VII
**Violation of Minnesota Prevention of Consumer Fraud Act**
**Minn. Stat. § 325F.69, *et seq*., Against Defendant on Behalf of the Class, or alternatively the Subclass pursuant to state law**

191.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

192.    Plaintiff is a resident of the State of Minnesota.

193.    Defendant is a "person" within the meaning of the Minnesota Prevention of Consumer Fraud Act ("MPCFA").

194.    Defendant's representations with respect to the Contaminated Baby Foods were made in connection with the sale of the Contaminated Baby Foods to Plaintiff and the Class.

195.    Defendant knowingly acted, used, and employed fraud, false pretenses, false promises, misrepresentations, misleading statements, and deceptive practices in connection with the sale of its Contaminated Baby Foods.  Defendant's non-disclosure and/or concealment of the toxins in the Contaminated Baby Foods, coupled with the misrepresentations alleged herein that were intended to and did, in fact, cause consumers like Plaintiff and the Class, to purchase products they would not have if the true quality and ingredients were disclosed, including that they were not nutritious, healthy, and safe baby foods as promised by Defendant and instead had a risk and/or actual inclusion of Heavy Metals, including levels that exceed FDA and EPA guidance.

196.    Defendant knew or should have known the Contaminated Baby Foods did not have the quality and ingredients described above because they contained, and/or had a material risk of containing, heavy metals and/or any other ingredients or contaminants that do not conform to the packaging claims.

197.    Defendant intended for Plaintiff and the Class to rely on and accept as true these representations in deciding whether to purchase the alleged Contaminated Baby Foods.

198.    Defendant's unfair or deceptive acts or practices were likely to deceive reasonable consumers about the Contaminated Baby Foods' quality, ingredients, fitness for consumption and, by extension, the true value of the Contaminated Baby Foods. Plaintiff and the Class relied on, and were in fact deceived by, Defendant's representations and omissions respect to the Contaminated

Baby Foods' quality, ingredients, and fitness for consumption in deciding to purchase them over competitors' baby foods.

199.    Defendant's unlawful conduct is continuing, with no indication that Defendant intends to cease this fraudulent course of conduct.

200.    As a direct and proximate result of Defendant's conduct, Plaintiff and the Class have suffered actual damages in that they purchased the Contaminated Baby Foods that were worth less than the price they paid.

201.    Plaintiff and the members of the Class would not have purchased the Contaminated Baby Foods at all had they known of the presence of these non-conforming ingredients, contaminants, and/or unnatural or other ingredients.

202.    Pursuant to Minn. Stat. § 8.31, subd. 3a, and § 325F.69, Plaintiff and the Class seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available thereunder for Defendants' violations of the MPCFA.

## COUNT VIII

**Breach of Express Warranty Against Defendant on Behalf of the Class or alternatively the Subclass pursuant to state law**

203.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

204.    As set forth herein, Defendant made express representations to Plaintiff and the Class that the Contaminated Baby Foods were healthy, nutritious and safe baby foods.

205.    These promises became part of the basis of the bargain between the parties and thus constituted express warranties.

206.    There was a sale of goods from Defendant to Plaintiff and the Class members.

207.     On the basis of these express warranties, Defendant sold to Plaintiff and the Class members the Contaminated Baby Foods.

208.     Defendant knowingly breached the express warranties by including Heavy Metals and Perchlorate in the Contaminated Baby Foods.

209.     Defendant was on notice of this breach as it was aware of the included Heavy Metals and Perchlorate in the Contaminated Baby Foods, and based on the public investigation by the nonprofit organization, Healthy Babies Bright Futures, that showed its baby food products as containing Heavy Metals and Perchlorate.

210.     Privity exists because Defendant expressly warranted to Plaintiff and the Class that the Contaminated Baby Foods were healthy, nutritious and safe baby foods.

211.     Plaintiff and the Class members reasonably relied on the express warranties by Defendant.

212.     As a result of Defendant's breaches of its express warranties, Plaintiff and the Class sustained damages as they paid money for the Contaminated Baby Foods that were not what Defendant represented.

213.     Plaintiff, on behalf of herself and the Class, seek actual damages for Defendant's breach of warranty.

## COUNT IX

**Breach of Implied Warranty of Merchantability Against Defendant on
Behalf of the Class or, alternatively the Subclass pursuant to state law**

214.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

215.     Defendant is a merchant engaging in the sale of goods to Plaintiff and the Class members.

216.    There was a sale of goods from Defendant to Plaintiff and the Class members.

217.    At all times mentioned herein, Defendant manufactured and/or sold the Contaminated Baby Foods, prior to the time the Contaminated Baby Foods were purchased by Plaintiff and the Class, Defendant impliedly warranted to Plaintiff, and to the Class, that the Contaminated Baby Foods were of merchantable quality and fit for the use for which they were intended.

218.    Plaintiff and the Class relied on the skill and expertise of Defendant in purchasing and feeding the Contaminated Baby Foods to their children.

219.    The Contaminated Baby Foods were unfit for their intended use and were not of merchantable quality, as warranted by Defendant. Instead, the Contaminated Baby Foods had the risk of and/or actual inclusion of Heavy Metals and Perchlorate, including levels that exceed FDA and EPA guidance.

220.    Defendant breached the implied warranty of merchantability because of the risk and/or actual inclusion of Heavy Metals and Perchlorate, including levels that exceed FDA and EPA guidance in the Contaminated Baby Foods.

221.    Defendant was on notice of this breach as it was aware of the inclusion of Heavy Metals and Perchlorate in the Contaminated Baby Foods, and based on the public investigation by the nonprofit organization, Healthy Babies Bright Futures, that showed its baby food products as containing Heavy Metals and Perchlorate.

222.    Privity exists because Defendant impliedly warranted to Plaintiff and the Class members through the warranting, packaging, advertising, marketing, and labeling that the Contaminated Baby Foods were healthy, nutritious and safe baby foods, and by failing to make any mention of Heavy Metals and Perchlorate.

223.    As a result of Defendant's breach of its implied warranties of merchantability, Plaintiff and the Class sustained damages as they paid money for the Contaminated Baby Foods that were not what Defendant represented, in an amount to be determined at trial.

## COUNT X

**Breach of Implied Warranty of Fitness for a Particular Purpose Against Defendant on Behalf of the Class alternatively the Subclass pursuant to state law**

224.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

225.    At the time of contracting, Defendant had reason to know of Plaintiff's and Class members' particular purpose for purchasing the Contaminated Baby Foods.

226.    Plaintiff and the Class relied on Defendant's skill or judgment to select or furnish suitable goods, thereby creating an implied warranty that the goods would be fit for such purpose.

227.    The Contaminated Baby Foods were not fit for these purposes, thereby causing injuries to Plaintiff and the Class members.

## COUNT XI

**Unjust Enrichment Against Defendant on Behalf of the Class or alternatively the Subclass pursuant to state law**

228.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

229.    Substantial benefits have been conferred on Defendant by Plaintiff and the Classes through the purchase of the Contaminated Baby Foods. Defendant knowingly and willingly accepted and enjoyed these benefits.

230.    Defendant either knew or should have known that the payments rendered by Plaintiff were given and received with the expectation that the Contaminated Baby Foods would

have the qualities, characteristics, ingredients, and suitability for consumption represented and warranted by Defendant. As such, it would be inequitable for Defendant to retain the benefit of the payments under these circumstances.

231.    Defendant's acceptance and retention of these benefits under the circumstances alleged herein make it inequitable for Defendant to retain the benefits without payment of the value to Plaintiff and the Classes.

232.    Plaintiff and the Classes are entitled to recover from Defendant all amounts wrongfully collected and improperly retained by Defendant, plus interest thereon.

233.    Plaintiff and the Classes seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available under the laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, pray for judgment against the Defendant as to each and every count, including:

A.    An order declaring this action to be a proper class action, appointing Plaintiff and her counsel to represent the Class, and requiring Defendant to bear the costs of class notice;

B.    An order enjoining Defendant from selling the Contaminated Baby Foods until the higher and/or unsafe levels of Heavy Metals and Perchlorate are removed;

C.    An order enjoining Defendant from selling the Contaminated Baby Foods in any manner suggesting or implying that they are healthy, nutritious, and safe for consumption;

D.    An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling existing products;

E.    An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's past conduct;

F.      An order requiring Defendant to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising, or a violation of state law, plus pre- and post-judgment interest thereon;

G.      An order requiring Defendant to disgorge or return all monies, revenues, and profits obtained by means of any wrongful or unlawful act or practice;

H.      An order requiring Defendant to pay all actual and statutory damages permitted under the counts alleged herein;

I.       An order requiring Defendant to pay punitive damages on any count so allowable;

J.       An order awarding attorneys' fees and costs to Plaintiff and the Class; and

K.      An order providing for all other such equitable relief as may be just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: February 19, 2021                     Respectfully submitted,

                                            CUNEO GILBERT & LADUCA, LLP

                                            By: s/ Charles J. LaDuca
                                            Charles LaDuca
                                            Katherine Van Dyck
                                            C. William Frick
                                            4725 Wisconsin Avenue NW, Suite 200
                                            Washington, DC 20016
                                            Telephone:(202) 789-3960
                                            Facsimile: (202) 789-1813
                                            E-mail: charles@cuneolaw.com
                                                    kvandyck@cuneolaw.com
                                                    bill@cuneolaw.com

LOCKRIDGE GRINDAL NAUEN P.L.L.P.
Robert K. Shelquist
Rebecca A. Peterson
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
E-mail: rkshelquist@locklaw.com
        rapeterson@locklaw.com

LITE DEPALMA GREENBERG, LLC
Joseph DePalma
Susana Cruz Hodge
570 Broad Street, Suite 1201
Newark, NJ 07102
Telephone: (973) 623-3000
E-mail: jdepalma@litedepalma.com
        scruzhodge@litedepalma.com

*Attorneys for Plaintiff Jodi Smith*